UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN R. MARNELL,

                Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____

<u>DECISION & ORDER</u>

17-CV-6201P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff John R. Marnell ("Marnell") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 16).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 14). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Marnell's motion for judgment on the pleadings is denied.

**BACKGROUND**

**I.**     **Procedural Background**

Marnell protectively filed for DIB on May 28, 2013, alleging disability beginning on June 1, 2012, due to bipolar disorder and depression.  (Tr. 175, 178).[1]  On August 5, 2013, the Social Security Administration denied Marnell's claims for benefits, finding that he was not disabled.  (Tr. 85-89).  Marnell requested and was granted a hearing before Administrative Law Judge David J. Begley (the "ALJ").  (Tr. 90-91, 116-20).  The ALJ conducted a hearing on August 14, 2015.[2]  (Tr. 28-57).  In a decision dated August 26, 2015, the ALJ found that Marnell was not disabled and was not entitled to benefits.  (Tr. 10-27).

On February 7, 2017, the Appeals Council denied Marnell's request for review of the ALJ's decision.  (Tr. 1-6).  Marnell commenced this action on April 5, 2017, seeking review of the Commissioner's decision.  (Docket # 1).

**II.**     **Relevant Medical Evidence**[3]

**A.**     **Medical Records**

**1.**     **Tinu Addams Medical, PC**

On December 31, 2012, Marnell participated in a psychiatric intake evaluation at Tinu Addams Medical, PC.  (Tr. 248-49).  Marnell complained of increased symptoms of depression, including increased irritability, mood swings, anger, frustration, suicidal ideation, crying, insomnia, and general malaise and decrease in normal interests.  (*Id.*).  He reported that

---

[1]  The administrative transcript shall be referred to as "Tr. ___."

[2]  The hearing was originally scheduled for April 24, 2015, but was adjourned to permit Marnell to obtain legal representation.  (Tr. 58-75).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

he had not been employed since May 2012 and had been fired from a previous job due to poor attendance and tardiness. (*Id.*). He reported episodes of increased energy lasting one to two days, which generally occurred monthly. (*Id.*). He indicated that he socialized with a few friends, but that he was otherwise withdrawn and had no daily routine. (*Id.*). He primarily slept during the day and spent the evenings on the computer. (*Id.*).

Marnell indicated that he previously had been treated by a therapist, but had stopped because he did not find the treatment helpful. (*Id.*). Marnell had been taking Celexa daily since 2007, which he found somewhat helpful. (*Id.*). Marnell lived at home with his parents and his sister, and had attended four years of college but had not obtained a degree. (*Id.*). He was assessed to suffer from bipolar disorder and generalized anxiety disorder and was prescribed Lamictal and advised to continue taking Celexa. (*Id.*). He was referred for a sleep study. (*Id.*).

Marnell returned for an appointment with Catherine A. Grasta ("Grasta"), NPP, on January 28, 2013. (Tr. 246-47). Marnell expressed agreement with the bipolar diagnosis and indicated that he experienced increased depression if he did not take Celexa. (*Id.*). Marnell reported racing thoughts, periods of increased energy, difficulty falling asleep, low energy, and poor concentration. (*Id.*). A mental status examination of Marnell was essentially normal, with appropriate appearance, cooperative attitude, calm motor activity, appropriate speech, euthymic mood and affect, goal-oriented thought processes, and intact cognition. (*Id.*). Marnell reported that he was tolerating his medication without any physical discomfort, and Grasta instructed him to incrementally increase his Lamictal dosage. (*Id.*).

Marnell did not return for an appointment with Grasta until May 9, 2013, more than three months later. (Tr. 245). During that appointment, Marnell reported that he had

stopped taking all of his medication approximately two months earlier because some made him ill. (*Id.*). Marnell complained of increased depression, bouts of mania and hypomania, and feelings of paranoia. (*Id.*). He reported moderate energy and concentration and that he continued to spend time with friends. (*Id.*). A mental status examination was normal, and Grasta instructed Marnell to continue taking Celexa and to restart Lamictal and gradually increase the dosage. (*Id.*).

The following month, Marnell returned for an appointment with Grasta. (Tr. 244). He reported that he generally experienced about three good days a month; and on other days, he experienced depression or mania with rapidly cycling moods. (*Id.*). According to Marnell, he slept during the day because he had difficulty sleeping at night. (*Id.*). Marnell explained that he had attended college for more than four years, but missed his senior recital due to appendicitis and never obtained a degree. (*Id.*). He reported that he had attended a sleep study intake appointment, but had not returned for the study because he had not wanted to wear a mask. (*Id.*). A mental status examination was normal except for suicidal thoughts without plan. (*Id.*). Marnell reported that he was tolerating his medication without physical discomfort, and Grasta instructed him to continue his medication and to gradually increase the Lamictal dosage. (*Id.*).

Marnell attended another appointment with Grasta on July 11, 2013. (Tr. 321-22). He reported that he was not doing well and was experiencing depression, anxiety, apathy, and thoughts of suicide. (*Id.*). He reportedly spent his days sleeping or playing video games, and he smoked marijuana to alleviate his suicidal urges. (*Id.*). Marnell indicated that he would not harm himself because of the effects of such action on his family. (*Id.*). He reported that he had recently joined a gym and planned to begin exercising and to audition for a role in an

upcoming production at a local college. (*Id.*). Marnell had been inconsistent with his medication due to "chaos in his life." (*Id.*). His mental status examination was essentially normal, and Marnell agreed to continue taking his medication and to continue to increase the Lamictal dosage. (*Id.*).

During his appointment the following month, Marnell reported that he had not been taking his medication for three to four weeks. (Tr. 319-20). According to Marnell, his medication caused gastrointestinal issues. (*Id.*). Marnell reported an increase in symptoms, including sadness, decreased interest in socialization, varied sleep, apathy, poor energy, and suicidal ideation. (*Id.*). According to Marnell, he had difficulty maintaining an exercise routine, had been unable to cope with the stress associated with auditioning for the production, and had experienced a steady decline in his mood. (*Id.*). Grasta discussed a suicide safety plan with Marnell and his mother, and she suggested that Marnell be admitted to a partial hospitalization program. (*Id.*). Grasta counseled Marnell regarding consistency with his medication and suggested that his gastrointestinal issues stemmed from his diabetic medicine, not the medication that she prescribed and advised him that he should not have stopped all of his medication. (*Id.*). Marnell agreed to restart Celexa and to take Neurontin for his anxiety. (*Id.*).

On September 18, 2013, Marnell attended another appointment with Grasta. (Tr. 318). He reported that he had restarted his medication and that he was feeling "much better." (*Id.*). He decided not to participate in the partial hospitalization program and was socializing more often with friends. (*Id.*). He reported good sleep and appetite but that he felt tired and his concentration was poor. (*Id.*). Grasta recommended that Marnell continue taking Celexa and Neurontin, start exercising, and return in four to six weeks. (*Id.*).

Marnell returned for another appointment with Grasta on October 16, 2013. (Tr. 317). He reported that he believed that Celexa and Neruontin were working well together and that his depression had decreased. (*Id.*). He had been spending his days with friends and watching television. (*Id.*). Grasta recommended that Marnell continue his medication as prescribed, start exercising, and attend an anxiety and depression group at Strong. (*Id.*). During an appointment the following month, Marnell reported that he was losing weight, although not exercising, and that his moods were mostly stable. (Tr. 315). He left the house most days and spent time with friends. (*Id.*). He also indicated that one of his teachers had suggested that he suffered from ADHD. (*Id.*).

In December 2013, Marnell told Grasta that he continued to take his medication as directed and that he was feeling "okay," although he continued to use marijuana several times a week. (Tr. 314). He reported that he was spending time with friends and would be babysitting his two-year-old niece. (*Id.*). In January 2014, Marnell told Grasta that he had not taken Celexa for approximately one week during the holidays, but had restarted it. (Tr. 313). He reported that he lacked focus and motivation. (*Id.*). Grasta recommended that Marnell try Concerta as a treatment option for ADHD. (*Id.*).

In February 2014, Marnell met with Grasta and reported that he had again stopped taking his medication. (Tr. 311). He reported an incident in which he recently had "pulled a knife on himself," but indicated that he was sleep deprived at the time and had not hurt himself. (*Id.*). He stopped taking Concerta after a few days because he did not find it effective and stopped taking Neurontin because it had "just fell to the wayside." (*Id.*). He continued to consume marijuana and spend time with friends and family, and he reported better sleep and varied energy levels. (*Id.*). Grasta noted that Marnell had not been taking his medication for

approximately one month and that he was having increased depressive symptoms and thoughts of suicide. (*Id.*). She recommended that he restart Celexa. (*Id.*).

Marnell returned approximately two weeks later and reported that he was doing much better after restarting Celexa. (Tr. 310). According to Marnell, his sleep had returned to a normal pattern, his moods were happy and more even, and he was not experiencing aggressive or irritable episodes. (*Id.*). He was seeing his friends more often and agreed to restart Neurontin and Concerta. (*Id.*). During an appointment on April 10, 2014, Marnell reported that the Neurontin was relieving his anxiety and that his moods remained good. (Tr. 309). He had tried Concerta, but it made him feel "weird," and he discontinued it. (*Id.*). Grasta recommended that he continue his current medication regimen and return in three months. (*Id.*).

On July 9, 2014, Marnell attended another appointment with Grasta. (Tr. 308). He reported that he was doing "okay," although he was depressed over his inability to work and earn income. (*Id.*). Marnell reported that he had been taking insulin since the end of April, and that he took Celexa at the same time, which caused him to be more consistent with his medication regimen. (*Id.*). Grasta recommended that Marnell continue his current medication and consider being more active. (*Id.*).

During an appointment on November 12, 2014, Marnell reported that he had stopped taking his medication for approximately one month. (Tr. 356). At the time he was in a "dark place," but was feeling better since restarting the medication, which "dulled" his depression. (*Id.*). Grasta again encouraged Marnell to exercise and recommended that he return in three months. (*Id.*). In February 2015, Marnell reported that had once again stopped taking his medication but had resumed sometime in January. (Tr. 357). He reported feeling good and that he had a gym membership and planned to start exercising regularly. (*Id.*).

On May 20, 2015, Marnell returned for another appointment with Grasta. (Tr. 361-62). He reported that he was doing okay, but that he had been off of his medication for approximately two months and had been experiencing low moods and suicidal ideation without plans. (*Id.*). Marnell expressed that he did not believe he was living up to his potential. A mental status examination was normal. (*Id.*). Grasta recommended that he restart his medication, attempt to volunteer one hour a week, mentor younger individuals with depression, and attend ACCESS for job coaching. (*Id.*).

Marnell met with Grasta on July 1, 2015. (Tr. 363-64). He reported that he was tired, had low energy, and had not been taking his insulin or Celexa as prescribed. (*Id.*). He reported that his mother was going to assist him to restart his medication regimen and that he was in the process of appealing the denial of his request for benefits. (*Id.*). Marnell continued to spend time with friends and to participate occasionally in family activities. (*Id.*). Grasta instructed Marnell to restart Celexa and to take Neurontin as needed for anxiety and foot pain. (*Id.*).

## 2. **Elmwood Medical Associates, PC**

On June 5, 2013, Marnell attended an appointment with Mentesinet Woldeyohannes ("Woldeyohannes"), MD, MPH, his primary care physician. (Tr. 263-66). Marnell reported that he had not been taking his medication for the previous two months, but had restarted them and had been monitoring his diet and did not have any significant complaints. (*Id.*). Treatment notes indicate that Marnell suffered from obesity, hypertension, depressive disorder, hyperlipidemia, hypothyroidism, and Type II diabetes mellitus. (*Id.*). Woldeyohannes recommended that Marnell continue his current medication and diet. (*Id.*).

Marnell returned for a follow-up visit on September 5, 2013.  (Tr. 270-73).

During the visit, he again reported that he had not been taking his medication for the previous

two months.  (*Id.*).  Woldeyohannes "strongly advised" Marnell to take his medication as

directed and to be regularly monitored by an endocrinologist.  (*Id.*).  Marnell had no complaints,

and Woldeyohannes advised him to maintain his current medication regimen and to maintain a

healthy diet and exercise regularly.  (*Id.*).

Marnell attended follow-up appointments with Woldeyohannes on December 18,

2013, and March 14, June 13, and October 9, 2014.  (Tr. 274-80, 301-04, 334-37).  During those

appointments, Marnell generally reported that he was compliant with his prescribed medication

and denied suffering from any significant symptoms.  (*Id.*).  Woldeyohannes advised him to

maintain his medication regimen and to diet and exercise.  (*Id.*).

### 3.    Rochester General Medical Group

On May 2, 2014, Marnell attended an appointment with Eric M. Griffith

("Griffith"), NP, at the Rochester General Medical Group Diabetes Care and Resource Center.

(Tr. 297-300).  Treatment notes indicate that Marnell suffered from Type 2 diabetes with

peripheral neuropathy complications.  (*Id.*).  Marnell reported that he had not been monitoring

his blood glucose levels.  (*Id.*).  The notes indicate that Marnell had experienced gastrointestinal

intolerance to Bydureon and Metformin SR.  (*Id.*).  Griffith recommended that Marnell begin to

monitor his blood glucose level three times a day and begin an exercise program.  (*Id.*).  Griffith

prescribed Metformin ER and Lantus and advised Marnell to contact him if he experienced any

gastrointestinal issues.  (*Id.*).

Marnell returned for an appointment with Seth S. Charatz ("Charatz"), DO, on

June 26, 2014.  (Tr. 305-07).  During the appointment, Marnell reported his blood glucose levels

and reported no gastrointestinal issues. (*Id.*). Charatz assessed that Marnell's diabetes was uncontrolled and advised him to increase his Lantus dosage, continue taking Metformin and Glipizide, and begin taking Farxiga. (*Id.*).

### B.  Medical Opinion Evidence

#### 1.  Christine Ransom, PhD

On July 8, 2013, state examiner Christine Ransom ("Ransom"), PhD, conducted a consultative psychiatric evaluation of Marnell. (Tr. 250-53). Marnell reported that he drove to the examination. (*Id.*). Marnell also reported that he had completed four and one-half years of college, but had difficulty maintaining employment and had not worked since May 2012. (*Id.*). He currently resided with his mother and father. (*Id.*).

According to Marnell, he had never been hospitalized for mental health issues and had been receiving psychiatric care and medication management for bipolar disorder since January 2013. (*Id.*). Marnell reported difficulty sleeping, mood swings, crying spells, energy highs and lows, racing thoughts, difficulty concentrating, and both fixated and wandering thoughts. (*Id.*). He reported that he socialized with two friends and his family, but avoided social situations due to anxiety. (*Id.*). He had recently joined a gym, but spent most of his time on the computer. (*Id.*). He denied suffering from socialized anxiety, panic attacks, thought disorder, or cognitive symptoms or deficits. (*Id.*). He had a history of marijuana dependence that began in 2004 and continued to the present. (*Id.*).

Marnell reported that he was able to care for his personal hygiene and complete household chores, including cooking, cleaning, laundry, and shopping. (*Id.*). Marnell reported that he was able to manage his money and to drive, but that he avoided the general public. (*Id.*).

Upon examination, Ransom noted that Marnell appeared casually dressed and adequately groomed.  (*Id.*).  Ransom opined that Marnell had fluent and intelligible speech with clear and moderately pressured voice, adequate language, coherent and goal-directed thought processes, moderately pressured affect and mood, clear sensorium, full orientation, adequate insight, adequate judgment, and above average intellectual functioning with an appropriate general fund of information.  (*Id.*).  Ransom noted that Marnell's attention and concentration were intact.  (*Id.*).  According to Ransom, Marnell could count backwards and perform simple calculations and serial threes without error.  (*Id.*).  Marnell's immediate and recent memory skills were intact.  (*Id.*).  According to Ransom, Marnell could recall three out of three objects immediately, three out of three objects after five minutes, and could complete five digits forward and three digits backward.  (*Id.*).

According to Ransom, Marnell was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule, and learn simple new tasks. (*Id.*).  He would have moderate difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress.  (*Id.*).  Ransom assessed that Marnell suffered from bipolar disorder, currently moderate, and marijuana dependence.  (*Id.*).  Ransom encouraged Marnell to continue psychiatric treatment.  (*Id.*).

## 2.      E. Kamin, PhD

On August 5, 2013, agency medical consultant Dr. E. Kamin (Kamin") completed a Psychiatric Review Technique.  (Tr. 79-80).  Kamin concluded that Marnell's mental impairments did not meet or equal listed impairments 12.04 or 12.09.  (*Id.*).  According to Kamin, Marnell suffered from mild limitations in activities of daily living, social functioning,

and maintaining concentration, persistence or pace. (*Id.*). Kamin completed a mental Residual Functional Capacity ("RFC") assessment. (Tr. 81-82). Kamin opined that Marnell did not suffer from any understanding and memory limitations, or sustained concentration and persistence limitations. (*Id.*). He also opined that Marnell suffered from some social interaction and adaptation limitations, including moderate limitations in his ability to interact appropriately with the general public, maintain socially appropriate behavior and adhere to basis standards of neatness and cleanliness, and respond appropriately to change in the work setting, but did not suffer limitations in his ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently of others. (*Id.*).

### 3. Grasta

On July 21, 2015, Grasta completed a Mental Impairment Questionnaire relating to Marnell. (Tr. 339-41). She indicated that she had been treating Marnell every one to three months since January 2013. Grasta opined that Marnell suffered from bipolar disorder, anxiety disorder and ADD, which he managed with Celexa and Neurontin. (*Id.*). She assessed that his prognosis was fair and that his mental status examination was essentially normal, although he suffered from ongoing depressed mood, difficulty following through on recommendations, lack of energy and motivation, and suicidal thoughts. (*Id.*). She opined that Marnell suffered from severe[4] limitations in his ability to understand, remember, or carry out multi-step instructions, maintain concentration and attention for extended periods, perform activities within a schedule,

---

[4] "Severe" was defined to mean "totally precluded." (*Id.*).

maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted by them, complete a normal workday/week without interruptions from psychologically-based symptoms, perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in a routine work setting. (*Id.*). Grasta also opined that Marnell suffered from moderately severe[5] limitations in his ability to remember locations and work-like procedures, understand, remember, or carry out one-step instructions, make simple work-related decisions, ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and meet basic standards of neatness and cleanliness. (*Id.*).

Grasta indicated that changes in work processes might cause severe mood or behavioral changes that would require Marnell to need unscheduled work breaks. (*Id.*). She also opined that Marnell would be absent approximately one day per month due to his mental impairments. (*Id.*).

Grasta supplemented her opinion in a letter addressed to the ALJ dated August 12, 2015. (Tr. 377). Grasta reported that Marnell suffered severe side effects, including nausea, when he took Metformin and that these side effects were "so severe that he ha[d] also stopped his psychiatric medications at times." (*Id.*). She further indicated that his "symptoms of depression, such as a lack of hope that his health will improve" also contributed to his failure to comply with his medication regimen. (*Id.*). Grasta also opined that Marnell was not currently

---

[5] "Moderately severe" was defined to mean "able to perform at 60-80% of normal expected productivity." (*Id.*).

13

able to work full-time due to his anxiety, mood swings, lack of energy, difficulty with follow-through, and suicidal thoughts. (*Id.*).

### III.  Non-Medical Evidence

Marnell was born in 1985 and was thirty years old at the time of the administrative hearing. (Tr. 33, 166). In connection with his request for benefits, Marnell reported that he lived with his family and spent the majority of his day on the computer or playing video games. (Tr. 185). He reported difficulty maintaining a consistent sleep schedule, but was able to care for his own personal hygiene, although he needed reminders to shower and to take his medicine. (Tr. 185-86). He was able to prepare simple meals, but had difficulty performing household chores due to lack of focus. (Tr. 186-87). Marnell reported that he was able to drive and go shopping as necessary. (Tr. 187-88). He indicated that he enjoyed reading, playing video games and watching television, and sometimes visited with friends. (Tr. 188-89).

According to Marnell, he frequently got angry at others and had difficulty controlling the expression of his feelings, particularly "mean" thoughts and profanity. (Tr. 189-90). Marnell reported difficulty focusing, but that he generally could complete tasks and follow instructions. (Tr. 191-92). Marnell also indicated that stress or schedule changes made him irritable. (Tr. 192).

Marnell reported suffering from anxiety, particularly during social situations or in connection with his request for benefits. (*Id.*). According to Marnell, his anxiety was characterized by fear, shortness of breath, rapid heartbeat, a desire to flee, an inability to focus or sleep, crying, and suicidal thoughts. (*Id.*). Marnell reported that he experienced anxiety attacks approximately once a month. (*Id.*).

Marnell's mother Kathy completed a function report in connection with Marnell's application for benefits. (Tr. 195-202). She reported that Marnell had difficulty sleeping and that he spent his days in his room, reading, watching television, and using the computer. (*Id.*). According to Kathy, Marnell was able to care for his own personal hygiene, although he needed reminders to shower and take his medication. (*Id.*). She indicated that Marnell could prepare simple meals and complete household chores, including cleaning and washing dishes, although he seldom did chores. (*Id.*).

Kathy reported that Marnell left the house daily and was able to drive, shop, and manage his finances. (*Id.*). Although he spent much time alone, Marnell went to his friend's house daily and attended doctor's appointments on his own. (*Id.*). According to Kathy, Marnell got angry easily and had difficulty completing tasks, getting along with others, concentrating, and managing stress. (*Id.*).

During the administrative hearing, Marnell testified that he was thirty years old, approximately six feet tall and weighed approximately 420 pounds. (Tr. 33). He reported prior work history as a telemarketer and in customer service providing technical and sales support. (Tr. 33-34). Marnell was fired from one position due to attendance issues and quit his other employment. (Tr. 34-35).

Marnell testified that he was unable to work due to his obesity, bipolar disorder, anxiety, and ADHD. (Tr. 35). According to Marnell, his depression, combined with his diabetes and thyroid issues, caused him to experience days of extremely low energy approximately three to four times a week. (Tr. 36). He also experienced anxiety, which caused him to be nervous and self-conscious in public settings. (*Id.*). Marnell testified that when he was employed, his anxiety caused nausea and other digestive issues that routinely required longer than authorized

breaks, which resulted in his termination. (*Id.*). According to Marnell, his anxiety was triggered by being around other people. (Tr. 45-46).

Marnell lived with his parents and sister and was able to drive. (Tr. 37-38). He testified that he had attended college for more than four years, but had not obtained a degree because he had not been able to participate in the vocal performance necessary to complete his program. (Tr. 38, 49-50). Marnell testified that since January 2013 he treated with Grasta every month to every three months. (Tr. 39). According to Marnell, Woldeyohannes had suggested that it would be a "good idea" to obtain mental health treatment in connection with his application for DIB. (*Id.*).

Marnell was unable to explain why he had repeatedly stopped taking his medication, although he surmised that it could "stem[] from the ADHD." (Tr. 40-42). He testified that he experienced very intense gastrointestinal issues for approximately three to seven days after restarting his medication. (Tr. 40-42, 48). At the end of that period, the side effects would cease. (*Id.*). As Marnell testified, "Once I'm back on it, I'm fine." (Tr. 40-41).

Marnell explained that his sleep schedule was very erratic. (Tr. 43). According to Marnell, he spent the majority of his time on his computer watching Netflix, playing video games, or perusing the internet. (*Id.*). He testified that he was able to care for his personal hygiene, but generally did not perform household chores. (Tr. 43-44). He socialized about twice a week with his friends. (Tr. 44). He consumed marijuana several times a week to alleviate his depression, suicidal thoughts, and anxiety, and to assist with focus. (Tr. 45, 47).

Bassey A. Duke ("Duke"), a vocational expert, also testified during the hearing. (Tr. 50-57, 160). The ALJ asked Duke to characterize Marnell's previous employment. (Tr. 51). According to Duke, Marnell previously had been employed as a customer service representative

and telemarketer. (Tr. 51-52). The ALJ asked Duke whether a person would be able to perform Marnell's previous jobs who was the same age as Marnell, with the same education and vocational profile, and who was able to perform the full range of work at all exertional levels, but who needed to avoid exposure to hazardous work environments, and was limited to simple, routine, repetitive tasks, in a low-stress environment, which included no production quotas or hazardous conditions, and required only occasional decision-making, changes in the work setting, and interaction with coworkers or supervisors and no direct interaction with the general public. (Tr. 52). Duke testified that such an individual would be unable to perform Marnell's past positions, but would be able to perform other jobs that existed in the national economy, including the positions of hand packager, small products assembler, and eyeglass frames polisher. (Tr. 52-53). Duke further testified that an individual could be off-task approximately five to ten minutes a day, excluding regular breaks, and absent approximately three times a quarter and still maintain employment, but an individual who was off-task or absent more than that would be unable to maintain employment. (Tr. 53-54).

## DISCUSSION

I.     **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*). The five steps are:

> (1)   whether the claimant is currently engaged in substantial gainful activity;
>
> (2)   if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)   if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)   if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)   if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.      The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims. (Tr. 13-24). Under step one of the process, the ALJ found that Marnell had

not engaged in substantial gainful activity during the period from his alleged onset through his

date last insured of June 30, 2014. (Tr. 15). At step two, the ALJ concluded that Marnell had

the severe impairments of bipolar disorder and general anxiety disorder. (*Id.*). The ALJ concluded that Marnell's ADHD, obesity, gastroesophageal reflux disease ("GERD"), obstructive sleep apnea, hyperlipidemia, and hyperthyroidism were not severe. (Tr. 15-16). At step three, the ALJ determined that Marnell did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 16-17). With respect to Marnell's mental limitations, the ALJ found that Marnell suffered from mild difficulties in his activities of daily living and moderate difficulties in social functioning and in maintaining concentration, persistence or pace. (*Id.*). The ALJ concluded that Marnell had the RFC to perform the full range of work at all exertional levels, but had to avoid hazardous machinery and unprotected heights, and was limited to performing simple, routine, and repetitive tasks, in a low stress job, involving no fixed production quotas, no hazardous conditions, occasional decision-making, changes in a work setting, and interaction with coworkers and supervisors, and no interaction with the general public. (Tr. 17-22). At steps four and five, the ALJ determined that Marnell was unable to perform his prior work, but that other jobs existed in the national and regional economy that Marnell could perform, including the positions of hand packager, small products assembler, and eyeglass frames polisher. (Tr. 22-23). Accordingly, the ALJ found that Marnell was not disabled. (*Id.*).

## B. **Marnell's Contentions**

Marnell contends that the ALJ's determination that he was not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 9-1, 15). First, Marnell contends that the ALJ's mental RFC assessment was flawed because he failed to properly weigh Grasta's opinion concerning Marnell's limitations.[6] (Docket ## 9-1 at 18-25; 15

_____

[6] In two footnotes, Marnell addresses the ALJ's conclusions and the record evidence relating to Attention Deficit Disorder ("ADD") and ADHD. (Docket # 9-1 at 17 n.13, 20 n.19). Those footnotes suggest that Marnell

at 6-8).  Next, Marnell maintains that the ALJ's credibility analysis is based upon an inaccurate and incomplete recitation of the record.  (Docket ## 9-1 at 25-28; 15 at 2-6).  Finally, he contends that the ALJ erred in relying on the vocational expert's testimony because the hypothetical posed to the expert was based upon a flawed RFC assessment.  (Docket ## 9-1 at 29-30).

## II.  Analysis

### A.  Mental RFC Assessment

I turn first to Marnell's challenge to the ALJ's mental RFC assessment.  (Docket ## 9-1 at 18-25; 15 at 6-8).  An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*,

_____

challenges the ALJ's conclusion that his ADD or ADHD was not severe or, at the very least, that the limitations associated with this impairment should have been considered when formulating the RFC.  The Court declines to address the ALJ's ADD/ADHD findings and conclusions because the only apparent challenge to them is relegated to footnotes.  *See, e.g.*, *F.T.C. v. Tax Club, Inc*., 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) ("[i]t is well settled . . . that a court need not consider arguments relegated to footnotes"); *Primmer v. CBS Studios, Inc.,* 667 F. Supp. 2d 248, 256 n.4 (S.D.N.Y. 2009) ("because the argument is made wholly in a footnote . . . , the [c]ourt may choose to disregard it"); *cf. Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[a] contention is not sufficiently presented for appeal if it is conclusorily asserted only in a footnote"); *Diesel v. Town of Lewisboro*, 232 F.3d 92, 110 (2d Cir. 2000) ("[w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review") (internal quotation omitted).  In any event, the ALJ considered Marnell's mental limitations, including his "difficulties with his concentration," in formulating the RFC.  (Tr. 20).  As discussed herein, the ALJ carefully accounted for Marnell's mental limitations in the RFC.

2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370

F. App'x 231 (2d Cir. 2010).

Marnell contends that the ALJ's mental RFC assessment was flawed because the

ALJ improperly discounted Grasta's opinions. (Docket ## 9-1 at 18-25; 15 at 6-8). An ALJ

should consider "all medical opinions received regarding the claimant." *See Spielberg v.*

*Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d))[7]. In

evaluating medical opinions, regardless of their source, the ALJ should consider the following

factors:

    (1)    the frequency of examination and length, nature, and extent
           of the treatment relationship;

    (2)    the evidence in support of the physician's opinion;

    (3)    the consistency of the opinion with the record as a whole;

    (4)    whether the opinion is from a specialist; and

    (5)    whatever other factors tend to support or contradict the
           opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*,

367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources,

state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(f)); *House v.*

*Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source are

evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

Under the regulations in effect at the time Marnell's claim was filed, nurse

practitioners are not considered "acceptable medical sources." 20 C.F.R. §§ 404.1513(a),

---

[7] This regulation applies to claims filed before March 27, 2017. For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

416.913(a) (previous versions effective until March 26, 2017).[8]  Instead, nurse practitioners are

considered "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d).  As

such, their opinions "cannot establish the existence of a medically determinable impairment," *see*

SSR 06-03P, 2006 WL 2329939, *2 (2006),[9] and are not entitled to "controlling weight," *see*

*Monette v. Colvin*, 654 F. App'x 516, 518 (2d Cir. 2016).  Their opinions may be used, however,

"to show the severity of the individual's impairment(s) and how it affects the individual's ability

to function."  *See id.*

Social Security Ruling 06-03P recognizes that "[m]edical sources . . . , such as

nurse practitioners . . . , have increasingly assumed a greater percentage of the treatment and

evaluation functions previously handled primarily by physicians and psychologists."  *Id.* at *3.

The ruling recognizes that such opinions are "important and should be evaluated on key issues

such as impairment severity and functional effects, along with the other relevant evidence in the

file."  *Id.*  The ruling directs the ALJ to use the same factors to evaluate opinions of medical

sources who are not acceptable medical sources, including licensed social workers and nurse

practitioners, as are used to evaluate opinions of acceptable medical sources.  *See Boyd v. Colvin*,

2016 WL 866345, *4 (N.D.N.Y. 2016); *Genovese v. Astrue*, 2012 WL 4960355, *14 (E.D.N.Y.

2012) (internal quotations omitted).  Although "[a]n ALJ is not required to give controlling

weight to [an other source's] opinion[,] . . . he is not entitled to disregard it altogether, [and] he

may use his discretion to determine the appropriate weight."  *Cordero v. Astrue*, 2013 WL

3879727, *3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5 (N.D.N.Y.) ("the Second

---

[8]  The regulations were amended effective March 27, 2017, to include licensed advanced practice registered nurses as acceptable medical sources, but only with respect to claims filed on or after March 27, 2017.  *See* 82 Fed. Reg. 5844-01 (Jan. 18, 2017); *Pilaccio v. Comm'r of Social Sec. Admin.*, 2017 WL 2789023, *3 (E.D.N.Y. 2017). The Court cites the version of the regulations in effect when the claim was filed.

[9]  Given the amendments to the regulations, this policy interpretation ruling has been rescinded effective March 27, 2017, for claims filed on or after that date.  *See* 82 Fed. Reg. 15263-01 (March 27, 2017).

Circuit has held that 'the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him") (quoting *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)), *report and recommendation adopted by*, 2012 WL 1605593 (N.D.N.Y. 2012); *Allen v. Astrue*, 2008 WL 660510, *9 (N.D.N.Y. 2008) (although not an acceptable medical source, "[a]s plaintiff's longtime treating psychotherapist and the only treating source who evaluated the disabling effects of plaintiff's mental impairments, [plaintiff's therapist's] opinion was relevant to the ALJ's disability determination[;] . . . [t]hus, the ALJ should have articulated why he discredited [the therapist's] reports").

Marnell maintains that the ALJ erred in several respects when he determined to give "little weight" to Grasta's opinion. (Docket ## 9-1 at 18-25; 15 at 6-8). According to Marnell, the ALJ failed to properly apply SSR 06-3p, failed to consider information contained in Grasta's treatment notes, ignored evidence in the record regarding Marnell's noncompliance with his medical regimen, erred in evaluating Kathy Marnell's statement, and improperly accorded greater weight to Ransom's opinion. (*Id.*).

With respect to SSR 06-3p, Marnell contends that the ALJ improperly applied that guidance by, among other things, inaccurately characterizing the frequency of Marnell's appointments with Grasta as "irregular." (Docket # 9-1 at 19). According to Marnell, the record demonstrates that Grasta initially met with Marnell on a monthly basis and then met with him quarterly. (*Id.*). Regardless of whether that schedule may properly be termed "irregular," the ALJ's use of that term does not warrant remand. Rather, his decision demonstrates that he considered the relevant factors under the ruling, including the nature of Grasta's treatment relationship with Marnell and the consistency of her opinion with the evidence in the record, in concluding that Grasta's opinion deserved limited weight. (Tr. 20-21). The decision makes

clear that the ALJ reviewed Grasta's treatment notes and was aware of the ongoing nature and frequency of her treatment relationship with Marnell.

Marnell argues that the ALJ's review of Grasta's treatment notes was unbalanced because he cited and relied only on the favorable portions of the treatment notes. (Docket ## 9-1 at 20-22; 15 at 6-8). Specifically, in Marnell's estimation, the ALJ unduly emphasized the "essentially normal" mental status examinations and relatively conservative treatment recommendations, but ignored other information in the records, including Marnell's persistent suicidal thoughts and ongoing struggles with depression and anxiety. (*Id.*). To the contrary, nothing in the decision suggests that the ALJ inappropriately considered only favorable portions of the treatment notes; rather, the decision reveals that the ALJ reviewed and summarized Marnell's medical records and identified information that he determined to be inconsistent with Marnell's allegations. (Tr. 18-20).

In advancing his challenge, Marnell disputes as inaccurate various terms and characterizations used by the ALJ in summarizing Grasta's treatment notes. For instance, Marnell highlights the ALJ's use of the term "passing 'fantasy'" when referencing his suicidal ideation; in fact, Grasta herself used the terms "passing fantasy" and "fantasy" in her treatment notes in discussing Marnell's thoughts of suicide, and Marnell himself used the term "suicidal fantasies" in describing triggers for his panic attacks in his application for benefits. (Tr. 19, 192, 246, 319). Marnell also disputes the ALJ's characterization of his mental health treatment as "conservative" and disagrees with the ALJ's conclusion that the treatment notes suggest that medication was generally effective in controlling his mental health symptoms. (Docket # 9-1 at 21). Semantics aside, the ALJ's conclusions that Marnell's condition improved with medication and periodic medication management appointments, provided that Marnell adhered to his

medication regimen, is well-supported by Grasta's treatment notes. (Tr. 244-49, 308-20, 356-64). With respect to the mental status examinations, Marnell surmises that Grasta did not in fact record Marnell's mental status at each appointment. (Docket # 15 at 7). That contention is based upon nothing more than speculation and does not justify remand.

I turn next to Marnell's contention that the ALJ improperly ignored relevant evidence in finding that the record did not support Grasta's conclusions as to the reasons for Marnell's noncompliance with his prescribed medication regimen – namely, that his noncompliance arose from gastrointestinal side effects and mental health impairments. (Docket # 9-1 at 22). As an initial matter, "while the ALJ must set forth the essential consideration with sufficient specificity to enable the reviewing court to determine whether the decision is supported by substantial evidence, he need not 'explicitly reconcile every conflicting shred of medication testimony,'" *see Ackerman v. Colvin*, 2015 WL 1499459, *9 (S.D.N.Y. 2015) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); in other words, the mere fact that an ALJ does not specifically mention certain evidence does not mean that such evidence was not considered, *see Adams v. Colvin*, 2014 WL 5529395, *7 (W.D.N.Y. 2014) ("an ALJ is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate that it was not considered") (internal quotations omitted). In any event, the ALJ specifically acknowledged that Marnell complained about side effects, but concluded that Marnell's complaints about the intensity of them was not credible and that Grasta's reliance upon side effects as an explanation for Marnell's medication noncompliance was not supported by the record. (Tr. 18).

As the ALJ recognized, Marnell complained of gastrointestinal side effects from his diabetic medication on a few occasions but the record suggested that the issues were largely

resolved. (Tr. 18-19, 20-21, 297, 319-20). Indeed, between June 2013 and July 2015, Marnell met with Grasta approximately thirteen times and with Woldeyohannes, who prescribed the diabetic medication, approximately six times, but he did not complain of any side effects or significant gastrointestinal issues during those visits.[10] (Tr. 263-66, 270-81, 301-04, 308, 309, 310, 311, 313, 314, 315, 317, 318, 334-37, 356, 357, 361, 363). Further, the ALJ also noted Marnell testified that he was no longer having side effects; as Marnell testified, the side effects disappeared after no more than a week. (Tr. 21, 40-42). Indeed, Marnell's mother stated that his medications did not cause any side effects. (Tr. 202). Finally, as the ALJ observed, Grasta counseled Marnell that the side effects about which he complained were not caused by his mental health medication, which he should continue to take. (Tr. 18). In sum, I find that substantial record evidence supports the ALJ's conclusion to accord little weight to Grasta's opinion that Marnell's noncompliance with his medication regimen resulted from side effects of the drugs. (Tr. 18, 42).

Marnell also disputes the ALJ's determination to accord "little weight" to his mother's statement. (Docket # 9-1 at 23-24). As his decision demonstrates, the ALJ considered the information provided by Kathy Marnell, but found it inconsistent with the objective medical evidence and medical opinions of record. (Tr. 21). Substantial evidence supports that assessment for the reasons the ALJ stated. *See Palmer v. Astrue*, 2011 WL 3881024, *5 (D. Vt. 2011) ("[t]here is substantial evidence supporting the ALJ's determination that statements by [plaintiff's family and friends] should be afforded little weight").

Marnell also challenges the ALJ's determination to give significant weight to Ransom's opinion that Marnell could engage in simple work with some moderate limitations.

---

[10] Marnell complained of occasional diarrhea during a visit with Woldeyohannes on October 9, 2014. (Tr. 334-37). Woldeyohannes attributed this to an infection, not to Marnell's medication regimen. (*Id.*).

(Docket # 9-1 at 24-25). Marnell maintains that it was improper for the ALJ to give greater weight to the consulting examiner, who only examined him on a single occasion, than to Grasta, his treating source. (*Id.*). Having reviewed the record and the ALJ's decision, I find that the ALJ provided "good reasons" for his decision to accord "little weight" to Grasta's opinions. In his decision, the ALJ explained that he discounted Grasta's opinions because he found them inconsistent with the record as a whole. (Tr. 20-21). In doing so, the ALJ discussed Grasta's treatment notes at length. Specifically, he noted that Marnell had received mental health treatment for several years and that his prescribed medication was effective in managing his mental symptoms. (Tr.18-20). According to the ALJ, Marnell's mental status examinations were generally within normal limits, although, as the ALJ also noted, he continued to have some thoughts of suicide. (Tr. 19). The ALJ further concluded that the record demonstrated that Marnell engaged in significant activities of daily living, including socializing with friends, caring for his personal hygiene, preparing simple meals, driving, shopping, managing money, and reading. (Tr. 20). The ALJ concluded that Ransom's opinion was consistent with the medical evidence, as well as Marnell's daily activities, and that the significant limitations assessed by Grasta were not. (Tr. 19-21).

    In sum, the ALJ's determination to accord "little weight" to Grasta's opinions for the reasons he explained was not improper. *See Scitney v. Colvin*, 41 F. Supp. 3d 289, 302-03 (W.D.N.Y. 2014) (ALJ properly discounted opinion of treating physician where the opinion was inconsistent with the record as a whole, including the opinions of state consultative physicians and claimant's testimony of daily activities); *Molina v. Colvin*, 2014 WL 3925303, *2 (S.D.N.Y. 2014) (ALJ did not err in declining to credit opinion of treating physician where the "opinion was contradicted by 'other substantial evidence in the record,' including two other doctors'

opinions"); *Atwater v. Astrue*, 2012 WL 28265, *4-5 (W.D.N.Y. 2012) (ALJ properly found treating physician's opinion inconsistent with record as a whole where opinion conflicted with opinions of state agency medical consultants and was inconsistent with claimant's reported activities), *aff'd*, 512 F. App'x 67 (2d Cir. 2013).

Moreover, the ALJ's RFC assessment was supported by substantial evidence. The record, particularly a longitudinal review of the treatment notes, demonstrates that although Marnell suffered from bipolar disorder and general anxiety disorder, his mental health symptoms and functioning generally improved when he was compliant with his prescribed medication regimen. (Tr. 244-49, 308-20, 356-64). Grasta generally counseled Marnell to comply with his prescribed medications and to become more active, often encouraging him to exercise. (*Id.*). By 2015, Grasta was recommending that Marnell attempt to volunteer, become a mentor, and consider attending job-training programming. (Tr. 361-62). The ALJ recognized that Marnell's mental impairments did cause limitations in his ability to perform work-related activities, and the ALJ carefully accounted for the limitations supported by the record in formulating the RFC. Specifically, the ALJ limited Marnell to positions involving simple, routine, repetitive tasks, with only occasional decision-making, no fixed production quotas, and limited interactions with others. (Tr. 17-22). The ALJ's RFC assessment was reasonable and supported by substantial evidence. *Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013).

**B.    Credibility Assessment**

I turn next to Marnell's contention that the ALJ's credibility analysis is flawed because he misinterpreted the evidence and failed to consider correctly the relevant factors. (Docket ## 9-1 at 25-28; 15). For the reasons explained below, Marnell's credibility challenge is no more availing that his RFC challenge.

An ALJ's credibility assessment should reflect a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom. *Id.* (citing 20 C.F.R. § 404.1529). Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record." *Id.* (citing 20 C.F.R. § 404.1529(c)). The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate [his] pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of [his] pain or other symptoms; (6) any measures the claimant uses or has used to relieve [his] pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

The ALJ concluded that Marnell's statements "concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible for the reasons explained in this decision." (Tr. 18). In doing so, the ALJ assessed Marnell's subjective complaints in the context of the entire record. I disagree with Marnell's contention that the ALJ mischaracterized the evidence or failed to properly weigh relevant considerations in reaching his determination.

Marnell maintains that the ALJ unduly relied on Marnell's daily activities and mischaracterized evidence suggesting that his ability to engage in such activities was limited. (Docket ## 9-1 at 26-28, 15 at 4-6). He also maintains that the ALJ unfairly relied on his history

30

of sporadic medication compliance and alleged "poor" work history. (*Id.*). None of these contentions warrants remand.

Of course, an ALJ is permitted to consider a claimant's daily activities in assessing credibility, although those activities are not necessarily determinative. *Cosme v. Colvin*, 2016 WL 4154280, *15 (W.D.N.Y. 2016). Nothing in the ALJ's decision suggests that his credibility determination rested solely upon his assessment of Marnell's daily activities, or that he unduly weighed that evidence. Among other things, the ALJ noted that despite Marnell's allegations that he was unable to get out of bed due to depression and vomited due to anxiety, Marnell was able to care for his personal hygiene, play video games, read books, prepare meals, shop, drive, socialize with friends, and manage his finances. (Tr. 18, 20). Contrary to Marnell's contention, I find that the ALJ adequately summarized the record regarding his functionality and considered and weighed the relevant evidence regarding his capabilities.

With respect to the ALJ's consideration of Marnell's adherence to a medication regimen, I find that the ALJ properly weighed the conflicting evidence about side effects and that substantial evidence supports the ALJ's conclusion that Marnell's noncompliance did not result from side effects from mental health drugs (discussed at length *supra*). Marnell maintains that he also had difficulty adhering to the regimen due to his depression, and that the ALJ failed to consider that cause. (Docket ## 9-1 at 27; 15 at 2-3). Apart from a vague and conclusory statement in Grasta's letter that Marnell's "non-compliance" was due to his "symptoms of depression" (Tr. 377), the record contains little evidence to suggest that Marnell's depression caused his noncompliance. Nothing in the treatment notes suggests that Grasta or Marnell attributed his failure to take his medication to his depression. Moreover, at the hearing, Marnell was unable to explain why he sometimes stopped taking his medication and speculated that the

cause might be related to his ADHD; he did not attribute it to his depression.  Viewed in its

entirety, the record lacks substantial evidence that Marnell's noncompliance was caused by his

mental impairments.  Accordingly, the ALJ did not err in considering Marnell's noncompliance

with recommended treatment as one factor weighing against his credibility.  *See Weed Covey v.*

*Colvin*, 96 F. Supp. 3d 14, 33 (W.D.N.Y. 2015) ("the ALJ was permitted to consider plaintiff's

noncompliance with treatment as a factor weighing against [p]laintiff's credibility[;] . . . [t]he

fact that the ALJ did not explicitly reference [p]laintiff's alleged mental impairments as a cause

for noncompliance does not mean that it was not considered").

Finally, I find that the ALJ fairly characterized Marnell's work history as poor

and properly considered it in evaluating Marnell's credibility.  Although Marnell disagrees with

the ALJ's characterization, he fails to demonstrate that the ALJ mischaracterized or overlooked

relevant information relating to that history.

I conclude that the ALJ applied the proper legal standards in analyzing Marnell's

subjective complaints and that substantial evidence supports the ALJ's determination that

Marnell's complaints were "not credible" for the reasons he stated.  *See Luther v. Colvin*, 2013

WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective complaints where she

"reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's

activities of daily living, inconsistent testimony and how her symptoms affected her attempts at

maintaining a job").

The gist of Marnell's challenge is a disagreement with the ALJ's consideration of

conflicting evidence.  "[U]nder the substantial evidence standard of review, [however,] it is not

enough for [p]laintiff to merely disagree with the ALJ's weighing of the evidence or to argue that

evidence in the record could support [his] position." *Warren v. Comm'r of Soc. Sec.*, 2016 WL

7223338, *6 (N.D.N.Y.), *report and recommendation adopted by*, 2016 WL 7238947 (N.D.N.Y. 2016). Rather, he must "show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record." *Id.*; *see also Avant v. Colvin*, 2016 WL 5799080, *3 (W.D.N.Y. 2016) ("[a]ll of [p]laintiff's arguments focus on the substantiality of the evidence supporting the ALJ's decision[;] [h]owever, as the Second Circuit has explained, 'whether there is substantial evidence supporting the claimant's views is not the question . . . , rather, the Court must decide whether substantial evidence supports the ALJ's decision'") (quoting *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) (brackets omitted)). The ALJ's decision in this case reflects that he weighed the record evidence, including the conflicting evidence; no basis exists for this Court to overturn the ALJ's assessment of the evidence or his resolution of the conflicts in it. *See Casey v. Comm'r of Soc. Sec.*, 2015 WL 5512602, *9 (N.D.N.Y. 2015) ("[i]t is the province of the [ALJ] to consider and resolve conflicts in the evidence as long as the decision rests upon adequate findings supported by evidence having rational probative force[;] ... [the ALJ] properly considered the totality of the record evidence, and concluded that the evidence quoted above outweighed [plaintiff's] evidence to the contrary") (internal quotation omitted).

## C.     Step-Five Assessment

I turn last to Marnell's challenge to the ALJ's step five assessment. (Docket # 9-1 at 29-30). Marnell argues that the ALJ erred in relying upon the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. (*Id.*). Because substantial evidence supports the ALJ's RFC determination, Marnell's contention fails. *See Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (citing *Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial

record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge")).

## **CONCLUSION**

After a careful review of the entire record, this Court finds that the Commissioner's denial of DIB was based upon substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 14)** is **GRANTED**.  Marnell's motion for judgment on the pleadings **(Docket # 9)** is **DENIED**, and Marnell's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                    *s/Marian W. Payson*
                   MARIAN W. PAYSON
           United States Magistrate Judge

Dated:  Rochester, New York
       July 30, 2018